# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-12-00350-CR
_____

### DENETTE ELIZABETH WILLIAMS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 12-07-07456-CR**

## MEMORANDUM OPINION

A jury found Denette Elizabeth Williams guilty of the first-degree felony offense of intentionally or knowingly, by omission, causing serious bodily injury to a child, Braylan Hood.[1] *See* Tex. Penal Code Ann. § 22.04(b)(1) (West Supp.

---

[1] The indictment spells the child's name, "Braylon Hood;" however, the evidence in the record supports that the correct spelling of the child's name is, "Braylan Hood."

2013).[2] The jury assessed punishment at fifteen years of confinement.  On appeal, Williams contends the trial court erred in admitting inadmissible testimonial hearsay at trial and that the evidence is legally insufficient to support her conviction.  After review of the trial record and application of the proper standards of review, we find no error in the trial court's admission of the complained of evidence, but do find insufficient evidence to support Williams's first-degree felony conviction and modify and render judgment of conviction for the lesser included second-degree felony offense of causing injury to a child recklessly by omission. *See id.* §§ 22.04(a)(1), (e). As modified, we affirm the finding of guilt, reverse the portion of the judgment imposing sentence, and remand the cause to the trial court for a new punishment hearing.

## I. Background

Braylan was born to Williams and J.P. Hood on February 1, 2011. He was born five weeks premature, weighing four pounds, nine ounces, and measuring about seventeen and a half inches in length.  After seven days in the hospital's neo-natal unit, Braylan was discharged into his parents' care on February 8, 2011, weighing about four pounds, seven ounces. On March 11, 2011, Williams called

---

[2] Appellant was convicted under a prior version of section 22.04 of the Penal Code. Because the subsequent amendments to this section do not affect the outcome of this appeal, we cite to the current version of the statute.

2

911 because Braylan had stopped breathing. Braylan was transported to Conroe Regional Medical Center for treatment, but medical professionals were unable to resuscitate him, and Braylan was pronounced dead in the early morning hours of March 12, 2011.

Following an investigation, Williams was arrested and charged with injury to a child by intentionally or knowingly failing to seek medical care for Braylan. A jury found Williams guilty and assessed punishment at fifteen years in the penitentiary.

## II. Sixth Amendment Right to Confrontation

Williams contends the trial court violated her Sixth Amendment right to confront the witnesses against her when it allowed Dr. Joni McClain to testify as a substitute witness for Dr. Meredith Lann, the pathologist who performed the autopsy on Braylan. Dr. Lann did not testify at trial. Instead, the State called Dr. McClain, who is the deputy chief medical examiner of Dallas County, to give her opinions regarding Braylan's injuries and cause of death. Dr. McClain was not present during the autopsy. Williams timely objected to Dr. McClain's testimony and argued that allowing her to testify about the content of Dr. Lann's work product denied her the right to confront Dr. Lann. At trial, Williams also objected to the admission of the autopsy photographs and slides because she was unable to

3

cross-examine the individual who took the photographs and made the slides. The trial court overruled Williams's objections. Williams argues on appeal that the admission of these exhibits was also reversible error.

The Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. This right also applies to out-of-court statements that are testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Confrontation Clause bars a witness's out-of-court testimonial statements, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Id.* at 68. The determination of whether a particular out-of-court statement is testimonial is a question of law. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). A court's error in admitting evidence in violation of a defendant's confrontation right is constitutional error, which requires reversal unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a).

In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court held that a forensic report prepared by an analyst in connection with a criminal investigation or prosecution was a testimonial statement, and thus subject to the

4

Confrontation Clause. 557 U.S. 305, 309-11 (2009). The Court emphasized that the analyst's certificates were created for "the sole purpose of providing evidence against a defendant[.]" *Id*. at 323. The certificates were executed under oath before a notary and were introduced to prove the nature of the substance found in the defendant's possession, which the Court concluded did "'precisely what a witness does on direct examination[.]'" *Id*. at 310-11. Absent a showing that the analyst was unavailable to testify and that the defendant had a prior opportunity to examine the analyst, the defendant was entitled to be confronted with the analyst at trial. *Id*. at 311.

Later, in *Bullcoming v. New Mexico*, the Supreme Court considered "surrogate" testimony regarding forensic reports in a DWI case and held that a blood analysis report was testimonial and that the expert who prepared the report must be the same person to present it at trial to satisfy the Sixth Amendment. 131 S. Ct. 2705, 2710 (2011). The Court analogized the facts to those in *Melendez-Diaz*. *Id*. at 2717. In *Bullcoming*, the officer provided seized evidence to a state laboratory utilized to assist the police in its investigation. *Id*. An analyst at the state laboratory tested the evidence and prepared a certificate containing his analysis. *Id*. The analyst formalized the certificate in a signed document, which was labeled as a report, and included a reference to the court rules that provide for

its admissibility at trial. *Id.* The Court concluded that the "formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial." *Id.* In her concurring opinion in *Bullcoming*, Justice Sotomayor stated, "We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." *Id.* at 2722 (Sotomayor, J. concurring).

In *Williams v. Illinois*, the Court made an allowance for an expert witness who had not personally been involved in any testing to testify at a bench trial. 132 S. Ct. 2221, 2227 (2012) (plurality op.). The Supreme Court concluded that admission of expert testimony regarding the results of DNA testing performed by a non-testifying analyst did not violate the Confrontation Clause. *Id.* at 2227-28. The testifying witness relied on a DNA profile procured from a third-party laboratory that had performed the DNA testing before a suspect was identified in a rape investigation. *Id.* at 2227-28, 2234. The plurality of the Court concluded that the defendant's rights were not violated. *Id.* at 2227-28, 2231.

> When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause. Applying

6

> this rule to the present case, we conclude that the expert's testimony did not violate the Sixth Amendment.

*Id.* at 2228. In distinguishing its opinions in *Melendez-Diaz* and *Bullcoming*, the Court explained that the report in *Williams* was used only to explain the basis for the expert's opinion and not to establish its truth. *Id.* at 2240-41. Also, in both *Melendez-Diaz* and *Bullcoming*, the certificates were introduced into evidence for substantive purposes. *Id.* at 2232-33.

We conclude this case is likewise distinguishable from *Melendez-Diaz* and *Bullcoming*. Here, the autopsy report was not admitted into evidence. Rather, Dr. McClain provided her own independent opinion about Braylan's injuries and cause of death, and was subject to cross-examination. Dr. McClain testified that she reviewed the entire autopsy file, including Dr. Lann's autopsy report, the autopsy photographs, and the microscopic slides. She testified that she formed an independent opinion that Braylan's death was caused by "blunt force injuries." She based her opinion on her independent review of the autopsy report, photographs, and tissue slides.

Like the report in *Williams*, Dr. McClain used the autopsy report in this case to explain the basis for her opinion. *See Williams,* 132 S. Ct. at 2232; *see also* Tex. R. Evid. 705(d) (Rule 705(d) allows an expert to disclose inadmissible facts or data underlying his opinion, but only if the value of the inadmissible evidence disclosed

7

is not outweighed by the danger that the inadmissible evidence will be used for another, impermissible purpose). We conclude that Dr. McClain's independent evaluation of the evidence collected during the autopsy did not violate the Confrontation Clause and the trial court did not err in admitting this testimony. *See Williams,* 132 S. Ct. at 2232; *see also* Tex. R. Evid. 705(d).

However, from our review of the record, it appears that Dr. McClain repeated a comment made by Dr. Lann, presumably from her autopsy report. After discussing a "Beta hemolytic Streptococcus group B" finding in Braylan's blood sample, Dr. McClain explained her basis for independently determining that the "Strep b" finding was a contaminant. She concluded her finding by stating, "So in my opinion, I agree with Dr. Lann. She also comments about that it is probable or possible contaminant." Assuming Dr. McClain obtained Dr. Lann's comment from the autopsy report, and assuming Williams properly preserved this error for review, we find that the error, if any, was harmless.

A violation of the Confrontation Clause is subject to harmless error analysis. *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010). We will reverse a trial court's judgment only if we determine beyond a reasonable doubt that the error contributed to the conviction or punishment. Tex. R. App. P. 44.2(a). "The error was not harmless if there is a reasonable likelihood that it materially affected the

8

jury's deliberations." *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). In making this determination, we consider (1) the importance of the hearsay evidence to the State's case, (2) whether the hearsay evidence was cumulative of other evidence, (3) the presence or absence of other evidence corroborating or contradicting the hearsay evidence on material points, and (4) the overall strength of the State's case. *Langham*, 305 S.W.3d at 582 (quoting *Scott v. State*, 227 S.W.3d 670, 690-91 (Tex. Crim. App. 2007)). Applying the relevant factors, we conclude Dr. McClain's statement as to Dr. Lann's comment did not materially affect the jury's deliberations.

Dr. McClain presented compelling testimony that the Strep b finding was a contaminant of the blood sample. She explained that when a medical examiner receives a positive result like this from a blood culture, the examiner then looks at the microscopic sections of the lungs and the cerebral spinal fluid to verify the results. In this case, Dr. McClain looked at both and found nothing to verify the Strep b finding. She also noted that with a bacterial infection like Strep b, she would have expected to find neutrophils or cells inside the lung alveolar areas, which she did not find in Braylan's lung areas. Based on these findings, Dr. McClain concluded the Strep b finding was a contaminant. Thus, while Dr. McClain informed the jury that Dr. Lann had drawn the same conclusion about the

Strep b finding, Dr. Lann's opinion is cumulative of other, properly admitted evidence, and, as such, we are satisfied, to a level of confidence beyond a reasonable doubt, that any error is harmless. *See* Tex. R. App. P. 44.2(a).

We also note that during defense counsel's cross-examination of Dr. McClain, counsel read from Dr. Lann's autopsy report several times and asked Dr. McClain questions that required her to read from the report as well. To the extent Williams is relying on testimony from Dr. McClain's cross-examination to support her Confrontation Clause argument, we conclude Williams cannot complain on appeal of testimony she elicited at trial. *See Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) ("[T]he law of invited error estops a party from making an appellate error of an action it induced."); *see also Costilow v. State*, 318 S.W.3d 534, 540 (Tex. App.—Beaumont 2010, no pet.) (when a party leads a court into error, he should be precluded from claiming reversal of judgment by reason of the error so committed).

Williams also contends the autopsy photographs taken by Dr. Lann during the autopsy were likewise inadmissible because Williams was denied the right to cross-examine Dr. Lann about the photographs. While Williams initially objected to the photographs at trial, counsel withdrew the objection and stated to the court, "We have no objection, Judge." Thereafter, the trial court admitted the

photographs as business records. Generally, a photograph or slide is not an out-of-court statement. *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Wood v. State*, 299 S.W.3d 200, 214-15 (Tex. App.—Austin 2009, pet. ref'd); *see also* Tex. R. Evid. 801(a). When counsel affirmatively stated to the trial court that counsel had no objection when the photographs were offered into evidence, Williams waived any error in the admission of these exhibits. *Gearing v. State*, 685 S.W.2d 326, 329 (Tex. Crim. App. 1985), *overruled on other grounds by Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997); *Holmes v. State*, 248 S.W.3d 194, 200 (Tex. Crim. App. 2008); *see also Hawkins v. State*, 964 S.W.2d 767, 769 (Tex. App.—Beaumont 1998, pet. ref'd) (noting confrontation clause error claims are subject to waiver if not timely presented to the trial court). We overrule this issue.

### III. Legal Sufficiency

Williams contends the evidence was legally insufficient to prove that she intentionally or knowingly caused serious bodily injury to Braylan by failing to seek reasonable medical care.

**A.    The Evidence**

Detective Nolan Fannin, the investigating officer, had Williams make a written statement. Williams's statement was entered into evidence and published to

11

the jury. According to Williams's written statement, on Friday, March 11, 2011, she awoke at 10 a.m. to feed Braylan. She states that Braylan consumed around sixty to seventy milliliters of formula. After Braylan had eaten, she changed his diaper, rocked him back to sleep, and then placed him in his crib. Between 1 and 2 p.m., she fed Braylan again, changed his diaper and clothes, and then the family left to go view apartments. In her statement, she does not indicate how much formula Braylan consumed at his 1 p.m. feeding. While they were out looking at apartments, they also went to First National Bank to withdraw money. They took Braylan inside the bank with them.

Robin Fowler, Amy Rao, and Jessica Lovell are employees at the bank and testified at trial that they saw Williams, J.P., and Braylan at the bank on March 11. Fowler testified that Williams was a former employee of the bank. She explained that Williams brought Braylan to the bank three or four times before March 11 to show Braylan to her former coworkers. She testified that on March 11, Braylan appeared "real thin[,]" [h]is eyes were gaunt[,]" he had no white in his eye, "his skin was [a] grayish" color, and "he was pushing some type of foam out of his mouth." Williams told Fowler that Braylan had scratched his eye and that she had taken him to the doctor. Fowler testified that if she had not known that Braylan had seen a doctor, she would have suggested to Williams that she needed to take him to

12

the emergency room. Fowler did not testify that Williams was acting strange, worried, or guilty, but rather, recalled that Williams acted as if it was "just another day" and did not seem overly concerned about Braylan's health.

Rao testified that Williams did not try to shield Braylan from allowing others to easily observe him. Rao noticed red scratches on Braylan's eyes, a white film around his mouth, and recalled that his eyes appeared to be "rolling in the back of his head." She testified that he was making "gurgling sounds." Rao testified she "had never seen a baby like that." She told Williams that Braylan looked sick, to which Williams replied that she had just taken Braylan to the doctor and that the doctor prescribed him antibiotics and told her "to give him a little bit of Benadryl to help him sleep."

Lovell testified that when she first saw Braylan, she instantly said, "'oh, poor baby, you look so sick[.]'" She recalled that Braylan did not move a lot, sounded congested, and looked as if he did not feel well. She explained, Braylan's "chest sounded [rattily]." She also noted a red spot in the corner of his right eye and a bruise above it. She testified that Williams told her that Braylan had scratched himself and bruised easily because he was anemic. Lovell did not pick up Braylan because he seemed too frail. When she lifted the blanket up and felt his feet, she recalled saying, "'Oh, his little feet are so cold.'" Lovell asked Williams if

13

she had taken Braylan to the doctor, and Williams indicated that she had, and was taking him back on the following Monday. Williams told Lovell that she had been giving Braylan Benadryl at night. She testified that Williams was smiling during the visit and seemed proud of Braylan.

The State admitted into evidence a surveillance video taken at the bank. The video portrays Williams and J.P. showing Braylan off to bank employees. They appear to be discussing Braylan and at one point in the video, Williams points to a spot on Braylan's head, as if to direct the other person to take a closer look. Williams smiles a number of times throughout the video and does not appear anxious or nervous.

According to Williams's statement, when they left the bank, she sat in the backseat with Braylan while J.P. drove. They went next door to eat lunch and then continued looking at apartments. Williams states, "[a]ll day the baby had been sleeping in his car seat in the back seat." They finished looking at apartments between 5:30 and 6:00 p.m. She states that she fed Braylan while he was in his car seat, located in the backseat of the car. In her statement, she indicated that Braylan ate between thirty to fifty milliliters and then fell back asleep. Williams states that they returned to their house to get Braylan's eye medication, a hat, a pair of socks, and another blanket. Once back in the car, she applied Braylan's eye medication,

14

put "baby [V]icks" on the bottom of his feet, covered his feet with socks, and then put a hat on his head to keep him warm. She explained that she put the "baby [V]icks" on his feet "because he had been sick with a head cold."

Next, they drove to another restaurant, not to eat, but to show Braylan to J.P.'s former manager, Lisa Foxworth. Foxworth confirmed that Williams and J.P. brought Braylan into the restaurant on March 11 around 7 p.m. She described Braylan as a "tiny little baby[]" and indicated he was sleeping during their visit. Williams and J.P. told Foxworth that Braylan had a full head of hair. When she tried to pull Braylan's hat off to see his hair, Braylan "squirmed a little bit" so she stopped.

After leaving the restaurant, they drove around to find a place to eat dinner. They picked up something for J.P. to eat and brought it home, but J.P. left again to get something for Williams to eat. All the while, Braylan continued to sleep in his car seat. After Williams ate her dinner, she recalled that she and J.P. watched a movie until around midnight. After the movie, Williams went into her bedroom and continued to watch television until J.P. came into the room to check on her and go to the restroom. While J.P. was in the restroom, Williams checked on Braylan, who was still in the living room in his car seat, and recalled that when she saw Braylan "his face was white." She "screamed" at J.P. and he ran to the living room,

15

took Braylan out of his car seat, started CPR, and told her to call 911. She ran outside and called 911. The 911 operator told her to perform CPR on Braylan, so she ran back inside the house and handed the phone to J.P. She then called her mother on another phone. When her mother arrived, Williams told her mother to go inside and check on J.P. and Braylan.

The State entered J.P.'s phone records into evidence, detailing a series of text messages sent from J.P.'s cell phone to Williams's cell phone approximately sixteen to eighteen minutes before they called 911 about Braylan's condition. The records revealed the following text exchange:

> Sent: U done yet
> Read: Don't talk to me
> Sent: Omg are u serious lose the attitude
> Sent: Ur the one that started this.
> Sent: Hello
> Sent: Hello
> Read: I am busy
> Sent: Oh ya doing what
> Sent: Justice will be served
> Sent: Let me know when [you are] done being nasty so we can talk.
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Sent: Hello
> Read: Say sorry and please get me cigarettes

16

Sent: I'm sorry
Sent: Hello
Sent: [Hello]
Read: [You are] missing something

During the course of Detective Fannin's investigation, he spoke with Williams at the hospital about the events leading up to Braylan's death. Williams denied having had an argument with J.P. prior to finding Braylan not breathing. Williams told Fannin, "everything was fine."

Detective Fannin testified that after Williams made her written statement, he and his partner conducted a videotaped interview of Williams regarding the incident. The trial court admitted the videotaped interview into evidence, and the State played it for the jury. Fannin testified that while Williams spoke with a "crying tone" during the interview, she did not have any tears coming out of her eyes.

In the video, after detectives explained to Williams that Braylan died from a broken neck, Williams remembered an incident that she failed to note in her written statement, which she believed occurred after Braylan's 1 p.m. feeding that day. She explained that as she burped Braylan, she held him under his neck while he was sitting on her knees. She recalled that when she "let go" of his neck, "his head flipped back and [she] pulled his head forward because it was falling back." In the video, Williams stated that when Braylan's neck went back, J.P. gasped and

17

said, "Denette!" to which she responded, "I didn't mean to!" She then stated to the detectives that she "grabbed [Braylan's] neck and pushed his head forward." She then handed Braylan to J.P. and said, "I guess he doesn't want any more to eat." J.P. then laid Braylan on his leg, and Braylan's head hung down and draped over J.P.'s leg. According to Williams, Braylan "was white, well not white, but…" and Williams never finishes this statement. Williams states that the only time she could have hurt him was during this incident while she was burping Braylan. She states, "I was just burping him though and his head flipped back and I didn't know what to do but grab and pull his head forward." She explained that she "didn't know why he was fussing" and she "was overwhelmed because [she] knew he was sick and [she] didn't know what to do to make him feel better." She later states that she did not know that she had hurt him; she just thought that he was sick. After that event happened, Williams asked J.P. to take Braylan's picture and send it to J.P.'s mother. Williams told the officers, "I knew he didn't seem the right color. And, I asked my husband, and my husband checked on him. My husband said that, 'He was just sick and it had to have been because of that.' And, I said, 'Do we need to take him to the doctor?'" In the video, Williams then tells the officers that two bank employees, whom she recalled were also mothers, told her that Braylan just looked pale and sick.

18

Williams told the officers that she did not call the doctor or take Braylan to the emergency room because she did not know she had hurt him. After Williams explained what had happened while she was burping Braylan, the officer asked her, "you knew he was hurt then" and after being repeatedly pressed, Williams admitted, "I knew that it had to have hurt him, but I didn't think it would break his neck. That's why I gave him to my husband." She states, "If I didn't hurt him when I was burping him, then I didn't hurt him." She told the officers that she thought she hurt him when she burped him because "he just stopped, he wasn't crying and he didn't cry anymore." The officer asked Williams if Braylan had stopped wiggling after the burping incident, and she states, "yes[.]" While in her statement, she indicated that Braylan ate between thirty to fifty milliliters of formula after 5:30 that afternoon, in her video interview, Williams admits that Braylan did not actually eat anything.

Officer Mark Frazier responded to the 911 call. When he arrived at Williams's house, he found her standing in the roadway waving him down. Williams was crying and had a "panicked demeanor[.]" During Frazier's investigation, J.P. told him that he and Williams had been watching a movie in their living room when they began to argue and Williams went into their bedroom. J.P. told Frazier that sometime later that night, he went to the restroom and

19

Williams went back into the living room, and that is when she returned and told J.P. that Braylan was not breathing.

Officer Frazier's car video camera captured his response to the 911 call. The trial court admitted the video into evidence and played it for the jury. During the video, Williams is shown sitting in the road as a firefighter brings Braylan to the ambulance. Williams cries, "somebody save him . . ." "no, I killed my son . . ." "oh my God what did I do . . ." "what did I do . . ." "he was in his car seat and he was just breathing and I looked at him and he was white . . ." "what did I do . . ." "he's not going to make it . . ." "I just want to die." Later in the video, Williams states, "It's all my fault, it's all my fault, I didn't take him to the doctor. I didn't take him to the doctor." Frazier testified that he had been at other crime scenes where something happens to a child, and it is a common reaction for parents to feel responsible.

Once at the hospital, Frazier was able to get a better look at Braylan's condition. He testified that Braylan had a bruise on his left check, blue and purple bruises on his neck, a scratch on his neck, a linear bruise on his left forearm, and his eyes were "red and bloodshot[.]"

Emergency responders noticed redness and bruising on and around Braylan's eyes, neck, face, jaw, and body. One of the paramedics specifically

recalled a "ligature mark around his neck[,]" which she described as "a bright red line[.]" Both paramedics testified that they believed that Braylan had been the victim of child abuse.

Dr. McClain testified that she believed Braylan's death was caused by "blunt force injuries[.]" She described injuries on the outside of Braylan's body, including bruises and abrasions. She also identified hemorrhaging in Braylan's muscle tissue around the spine and inside his spinal canal, both indicative of blunt trauma. She identified a break in Braylan's neck (cervical spine fracture), which she also attributed to blunt trauma. She explained to the jury that she had only seen that type of neck break result from major accidents, like vehicular or plane accidents. She testified it would take considerable force to break the neck of a five-week-old baby in such a manner. She did not testify that the break could not have been caused in the manner that Williams described the burping incident.

Dr. McClain also found evidence of seven old rib fractures, which she believed were probably weeks old. Dr. McClain testified that she did not believe these rib fractures resulted from CPR, but offered no other opinion as to these findings. She testified that a five-week-old baby with the kinds of injuries Braylan had "[would not] be acting normal;" and that, as time passed, Braylan probably would have had some trouble breathing. She testified that someone listening to

21

Braylan would notice that he was having difficulty breathing. She identified evidence of healing around the spinal canal, which usually takes about three days to present. Given this evidence, Dr. McClain testified that she believed Braylan's injuries would have occurred two to three days prior to his death. Dr. McClain testified that while Braylan's blood culture showed "Beta hemolytic strep, Group B," she believed this finding was the result of a contaminant in the sample.

Dr. McClain testified that she found no evidence of pneumonia, meningitis, or other problems with the lungs, but the autopsy did reveal that the lungs contained marked congestion, which Dr. McClain explained indicates a backup of blood. Dr. McClain testified that at the time of the autopsy Braylan was not suffering from an upper respiratory tract infection, but admitted she could not testify that he was not suffering with this infection four days prior to his death.

## B. The Standard of Review

We apply the *Jackson v. Virginia* legal-sufficiency standard to determine the sufficiency of the evidence to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We evaluate all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

22

*Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the jury's responsibility to fairly resolve conflicting testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13 (quoting *Jackson*, 443 U.S. at 318-19). The Court of Criminal Appeals has made it clear that we must review circumstantial evidence of intent with the same scrutiny as other elements of an offense. *Laster v. State,* 275 S.W.3d 512, 519-520 (Tex. Crim. App. 2009). In determining the sufficiency of the evidence to show a defendant's intent, and faced with a record that supports conflicting inferences, we "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). We are responsible for ensuring "that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). It is not the role of the appellate court to reweigh the evidence as presented in a cold record, but rather we evaluate the record to ensure the rationality of the factfinder and in so doing safeguard the defendant's due process rights. *Williams v. State*, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996)

(quoting *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995)); *see also Matson*, 819 S.W.2d at 846.

**C.    The Charge: Williams Knowingly or Intentionally Caused Serious Bodily Injury to a Child**

The indictment alleged that Williams "while having a legal duty, as a parent of [Braylan], to provide medical care to [Braylan], intentionally or knowingly, by omission, cause[d] serious bodily injury to [Braylan], a child 14 years of age or younger, by failing to seek proper medical care[.]" To sustain Williams's conviction for injury to a child, the evidence must prove that the Williams intentionally or knowingly, by omission, caused serious bodily injury to Braylan. *See* Tex. Penal Code Ann. § 22.04(a)(1). "Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750. The State has the burden to prove that the defendant caused a child's serious bodily injury with the requisite criminal intent. *Id.* Therefore, the State had to prove not only that Williams intentionally or knowingly failed to provide medical care, but also that she intentionally or knowingly caused the resulting injuries to Braylan by failing to obtain medical care. *See Johnston v. State*, 150 S.W.3d 630, 634 (Tex. App.—Austin 2004, no pet.). The Penal Code provides:

24

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann. § 6.03(a), (b). "The formulated distinction between intentional and knowing, as to results, is thus between desiring the result and being reasonably certain that it will occur." *Johnston*, 150 S.W.3d at 635. When the State charges a defendant with conduct by omission, proof that the defendant knowingly caused the result requires evidence that the defendant had a reasonably certain awareness that the injury would have been prevented had the defendant performed the act that was omitted. *Patterson v. State*, 46 S.W.3d 294, 302 (Tex. App.—Fort Worth 2001, no pet.). The jury may infer both intent and knowledge from any facts that tend to prove the existence of these mental states, including: Williams's acts, words, or conduct; and from the nature of the injury inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Even in the light most favorable to the State, our review of the record leads us to conclude that the record is devoid of evidence that Williams failed to seek

medical care for Braylan because she desired Braylan to suffer a serious bodily injury. Further, we conclude that there is no evidence in the record that Williams was aware that her failure to seek medical care for Braylan was reasonably certain to cause him serious bodily injury and that his injury would have been prevented had she sought such care.

The undisputed evidence in the record is that two pediatricians examined Braylan and testified that they believed that Williams had been properly taking care of him. Dr. McConnell examined Braylan on February 11 and found that he was doing well. She specifically noted that Braylan had no injuries, had gained weight, and appeared to be growing.

When Braylan showed symptoms that he was getting sick on March 8, Williams took him to see his pediatrician. Dr. Begum testified that she observed Williams with Braylan on March 8, just a few days before Braylan's death, and testified that Williams seemed caring and worried for Braylan because of his respiratory distress. Dr. Begum described Williams as "caring and bonded" to Braylan. Dr. Begum found that Braylan had nasal congestion, sneezing, a red eye, but no fever. She diagnosed Braylan with an upper respiratory infection and an eye infection, which she testified were very common in combination with upper respiratory symptoms. She recalled that Braylan "looked like a normal baby with a

26

little stuffy nose." She testified he "was not very sick looking, not lethargic" or "limp." Braylan was not in acute distress, which Dr. Begum explained, meant he was "not moaning, crying, . . . having any difficulty, having any kind of breathing problems. . . ." At this visit, Braylan weighed six pounds two ounces, was "well-nourished[,]" and had no indications of suffering from broken bones, neck, or ribs. Dr. Begum prescribed an ointment to treat Braylan's eye infection and symptomatic treatment, including, saline nose drops, suctioning, and dehumidifying for his respiratory infection.

After seeking medical care for Braylan for his respiratory illness, just two days later, Williams took Braylan to the WIC office on March 10 and indicated that she was concerned he was not getting enough to eat. The supervisor of the WIC office testified that a clerk in her office would have weighed and measured Braylan that day, and his weight was noted to be within the acceptable range. She testified that had the clerk noticed any types of bruise marks or other indication of injury, the clerk would have reported that to her; however, nothing had been reported to her.

Williams's written statement indicates that on the day of the incident, she fed or attempted to feed Braylan a number of times, she changed his diaper, and she rocked him to sleep. After showing Braylan to her former coworkers, Williams

went home to get Braylan's medicine and more clothing to keep him warm after one of the bank employees commented that Braylan's feet seemed cold. The evidence shows that Williams rubbed "baby Vicks" on the bottom of Braylan's feet because she believed that would help with his congestion. Williams then took Braylan to see J.P.'s former coworker, who recalled that Braylan smelled like Vicks during the visit.

Lovell, Williams's former coworker, testified that Williams seemed proud to be Braylan's mother and was excited to show him off to her former coworkers. Ted Williams, a college friend, testified that after having observed Williams with Braylan, he believed that she loved Braylan. Allison Kay testified that she knew J.P. and Williams and that they were excited when they found out they were having a baby. Amy Bryan testified that she and Williams had been best friends and that Williams was very happy that she was pregnant. Detective Fannin recalled that Williams was distraught and crying at the hospital the day Braylan died. There is no direct or circumstantial evidence that Williams intended Braylan to suffer serious bodily injury. The evidence indicates the opposite—that Williams desired Braylan to be well. Other than the burping incident, the State offered no other evidence to explain any other signs of injury to Braylan or the person responsible.

28

While Williams admitted she knew she had hurt Braylan when she was burping him, there is no evidence from which the jury could reasonably infer that she knew the extent or severity of his injuries, such that she knew or was reasonably certain that he needed immediate medical care or would suffer serious bodily injury. The record supports that Williams knew Braylan had been suffering from symptoms that are common to many childhood ailments, including an upper respiratory infection, which Braylan's pediatrician had just diagnosed a few days earlier. The State offered no evidence to show that Williams knew with reasonable certainty that Braylan was suffering from a life-threatening injury that needed immediate treatment.

While there is evidence that Williams caused Braylan's underlying injury, such evidence alone is insufficient to support a finding that Williams either intended or knew what the result would be if she failed to seek immediate medical attention for Braylan. Immediately after the burping incident, Williams was concerned that Braylan had been injured, so she handed Braylan to J.P. and asked J.P., who had had EMT training, if he thought they needed to take Braylan to the doctor. Williams indicated that J.P. told her that Braylan was just sick. Additionally, a number of other people observed Braylan that day, and while they acknowledged that he appeared sick, no one told Williams that she needed to take

Braylan immediately to the doctor or the emergency room. A number of witnesses testified that their concerns were alleviated when they found out that a doctor had recently examined Braylan.

While emergency personnel were trying to resuscitate Braylan, Williams made a number of statements indicating intense regret. Williams exclaimed that this was all her fault because she did not take Braylan to the doctor. Evidence of Williams's knowledge after she called 911, however, does not show her state of mind earlier that day. It does not indicate what Williams knew immediately after the burping incident or even what she knew as Braylan began to show various symptoms that, in hindsight, were attributable to his injury. Thus, without other evidence showing that Williams knew earlier in the day that her failure to seek immediate medical care for Braylan was reasonably certain to cause him to suffer serious injury or death, the statements Williams made after she was aware of the seriousness of his condition do not constitute legally sufficient proof, beyond a reasonable doubt, that Williams knowingly, much less intentionally, caused Braylan to suffer serious injury or death by omission. *See Williams*, 235 S.W.3d at 750 ("Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct."); *Alvarado v. State,* 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) ("What matters is that the

30

conduct (whatever it may be) is done with the required culpability to effect the *result* the Legislature has specified.").

Although a jury is permitted to draw reasonable conclusions and inferences from the evidence, there is not legally sufficient evidence to allow the jury to reasonably conclude that Williams knowingly or intentionally injured Braylan by deciding not to seek immediate medical treatment for his injury or symptoms he otherwise might have exhibited during the day. Concluding that the evidence was legally insufficient to sustain Williams's conviction for injury to a child in the first-degree, we reverse Williams's conviction for this offense.

## D. Recklessly Caused Injury to a Child

When the evidence is insufficient to prove the alleged offense, but sufficient to prove a lesser-included offense, we may modify the trial court's judgment. *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). Reckless injury to a child is a lesser-included offense of intentional and knowing injury to a child. *Wortham v. State*, 412 S.W.3d 552, 555 (Tex. Crim. App. 2013); *see also Contreras v. State*, 312 S.W.3d 566, 585 (Tex. Crim. App. 2010); Tex. Penal Code Ann. § 6.02(d) (West 2011); Tex. Code Crim. Proc. Ann. art. 37.09(3) (West 2006). "To sustain a conviction for reckless injury to a child the evidence must prove that a defendant recklessly, by act or omission, caused serious bodily injury

31

to a child." *Williams*, 235 S.W.3d at 750 (citing Tex. Penal Code Ann. § 22.04(a)(1)). The Penal Code explains,

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c) (West 2011). A "defendant's culpable state of mind is almost invariably proven by circumstantial evidence." *Morales v. State*, 828 S.W.2d 261, 263 (Tex. App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993). Culpable mental states can be inferred from the acts, words, and conduct of the accused, and from the extent of the victim's injuries and the relative size and strength of the parties. *See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see also Beaty v. State*, 156 S.W.3d 905, 908 (Tex. App.—Beaumont 2005, no pet.). Central to a finding of reckless conduct is a "'conscious disregard of the risk created by the actor's conduct[.]'" *Williams*, 235 S.W.3d at 751 (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). Criminal recklessness is not supported by only a showing that defendant lacked foresight, behaved stupidly, irresponsibly, thoughtlessly, or was careless.

*Williams*, 235 S.W.3d at 751. The Court of Criminal Appeals has explained reckless conduct:

> Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it. Such a 'devil may care' or 'not giving a damn' attitude toward the risk distinguishes the culpable mental state of criminal recklessness from that of criminal negligence, which assesses blame for the failure to foresee the risk that an objectively reasonable person would have foreseen. Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with other people's lives. This combination of an awareness of the magnitude of the risk and the conscious disregard for consequences is crucial. It is callous disregard of risk, and not awareness *vel non* of risk, however, which is critical. And, of course, determining whether an act or omission involves a substantial and unjustifiable risk requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight.

*Id.* at 751-53 (internal quotations and footnotes omitted). Reckless injury cases involve a "'conscious risk creation'" that "'resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability less than substantial certainty[.]'" *Id.* at 755 (quoting American Law Institute, MODEL PENAL CODE § 2.02, cmt. 3, at 236). The Court of Criminal Appeals summarized that in addressing recklessness, a reviewing court must examine a defendant's conduct to determine whether

(1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;

(2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others"),

(3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

(4) the defendant consciously disregarded that risk.

*Williams*, 235 S.W.3d at 755-56. Some of our sister courts have applied these principles of law in serious bodily injury to a child cases.

In *Britain v. State*, a defendant was convicted of recklessly causing serious bodily injury to her step-daughter by failing to seek medical treatment, resulting in the child's death. 392 S.W.3d 244, 245-46 (Tex. App.—San Antonio 2012), *aff'd*, 412 S.W.3d 518 (Tex. Crim. App. 2013). While at school, the child went to the nurse for a stomachache. *Id.* at 245. The nurse sent the child back to class twice, and then eventually called the child's parents to come and take her home. *Id.* at 245-46. That night the child started vomiting and ultimately stayed home from school the following day with defendant. *Id.* at 246. The child continued to vomit during the day. *Id.* The child died from complications arising from appendicitis. *Id.* The evidence in *Britain* supported that the step-mother knew that her step-daughter

was sick and had been vomiting for almost twenty-four hours. *Id*. at 248. While the school nurse, the State's expert physician, and the treating emergency room physician all agreed that a reasonable parent would have taken the child to the emergency room if the child had been vomiting for more than twenty-four hours, there was no evidence that the child had been vomiting more than twenty-four hours or that the defendant knew of such standard of care. *Id*. There was no evidence that the defendant knew there was a substantial risk that her step-daughter "would die from symptoms that are common to many childhood ailments and that persisted for less than twenty-four hours." *Id*. at 248-49. The San Antonio Court of Appeals concluded that a rational jury could not have found that defendant was aware of the substantial risk of death to her step-daughter. *Id*. at 249. Therefore, the court held the evidence legally insufficient for a rational jury to find beyond a reasonable doubt that defendant was subjectively aware of and consciously disregarded a substantial and unjustifiable risk that the step-daughter would suffer serious bodily injury or death if she did not receive medical treatment. *Id*.

In *Payton v. State*, the defendant was convicted of recklessly causing serious bodily injury to his eighteen-month old grandchild by failing to obtain reasonable medical care. 106 S.W.3d 326, 327-28 (Tex. App.—Fort Worth 2003, pet. ref'd). The defendant had custody of his grandchildren, but the children's biological

father and his girlfriend had visited the children the day before the child allegedly started demonstrating symptoms. *Id*. at 328. There was evidence at trial that the grandfather knew that his son abused the children. *Id*. at 331. The evidence at trial was that defendant was a former emergency medical technician, had taught classes in that field, and that he had changed the child's diaper that morning. *Id*. at 329. The emergency room nurse testified that she changed the child's diaper later that day and there was blood in the diaper. *Id.* A physician testified that the child's injuries would have occurred ten to twelve hours before his death and that the child would have been showing symptoms of the injuries. *Id*. The court found that the jury could have inferred from the evidence that the child would have been bleeding and the defendant would have noticed it. *Id*. The nurse testified that it was unlikely that the child would have been moving or walking around earlier in the morning with the level of injuries the child had received. *Id*. at 329-30. The defendant admitted that the child had been in a lethargic condition for about an hour before 911 was called. *Id*. at 330. The court held that defendant recklessly caused the child's injury when he had emergency medical training but failed to obtain reasonable medical care for his grandson who was experiencing visible signs of medical distress. *Id*.

In this case, the State's proof of intentional and knowing injury to a child necessarily included proof of reckless injury to a child. While there was insufficient evidence for a jury to reasonably conclude beyond a reasonable doubt that Williams knew with substantial certainty that Braylan would suffer serious bodily injury from her failure to obtain medical care, there is sufficient evidence that Williams was aware of a substantial and unjustifiable risk of serious bodily injury due to her omission. The State called Braylan's pediatrician, who testified that at the time of Braylan's well-baby check-up on February 11, 2011, she provided new parents, including Williams, with literature regarding signs of illness in newborn babies. The trial court admitted one of the handouts into evidence. The handout regarding illnesses of newborn babies indicates that a person should immediately call the healthcare provider if the baby has "[p]oor feeding behavior or a sudden change in feeding behavior[,]" "[s]leeps excessively--for instance, past feeding times[,]" has a "[c]hange in muscle tone (weak or limp)[,]" or a "[c]hange in color (pale, bluish or grey)[.]" Dr. McConnell testified that she spoke with Williams specifically about a change in Braylan's feeding habits, excessive sleepiness, excessive crying, and fever. Dr. McConnell warned Braylan's parents that if he started vomiting, had fever, or anything else abnormal or concerning, they should call her or go immediately to the emergency room. At this first visit,

Williams informed Dr. McConnell that Braylan was feeding normally, about every three hours. The day before the burping incident, Williams completed a WIC form detailing Braylan's Diet Health History, wherein she acknowledged that Braylan was consuming eight, three-ounce bottles of formula a day. Dr. McConnell testified in her opinion it would be "very concerning" for a child with this type of normal eating habits to suddenly go to not eating for nine to eleven hours.

The evidence showed that Braylan consumed only two-and-a-half ounces of formula during the entire day of March 11. Williams knew Braylan's eating habits and had to have known that this was a drastic deviation from his norm, and Williams knew that such changes were alone an important indicator that Braylan needed medical attention.

When Dr. Begum examined Braylan on March 8 for respiratory illness, Dr. Begum also instructed Williams to return to the clinic or to the emergency room if Braylan developed acute problems, fever, or worsening symptoms. Begum described acute symptoms to include fever, abnormal eating, lethargy, excessive crying, apparent discomfort, diarrhea, and vomiting.

Like *Britain*, Braylan's symptoms were of a short duration and could be confused with the preexisting symptoms from the upper respiratory infection. Unlike *Britain*, here the jury could infer from the evidence that Williams knew the

standard of care—if Braylan changed colors, slept excessively past feeding times, displayed abnormal eating, then she should immediately seek medical attention—but Williams chose to disregard that standard. Williams admitted that she was aware that she hurt Braylan while burping him. Braylan immediately reacted to the injury—he stopped wiggling, his color changed, and he did not cry again. She recalled that after the burping incident, Braylan continued to lose color throughout the day and did not cry or move around while in his car seat. Williams admits to being scared after pulling on Braylan's neck. When one of the detectives asked Williams if J.P. witnessed what had happened while she was burping Braylan, she responded that she did not know if he "saw how hard I was." From this evidence, the jury could have inferred that Williams was aware of how hard she pulled on Braylan's neck. There is evidence that Williams perceived that this injury could be substantial because she immediately asked J.P. if they should take Braylan to the doctor. Braylan showed visible signs of injury, which Williams recognized but chose to ignore. The jury could have also inferred from the evidence that Williams observed, but disregarded, the symptoms Braylan began showing over the course of the day. The record supports that Williams was aware that Braylan was having symptoms, but she attributed those symptoms to the respiratory infection he had been diagnosed with on March 8. The bank employees who observed Braylan were

satisfied with Williams's explanation of the symptoms as associated with a respiratory illness when she told them she had recently taken Braylan to the doctor. Nevertheless, Williams was aware that she had hurt Braylan by pulling on his neck earlier that day, and none of the witnesses indicated that Williams had disclosed this information to them. Even though there was insufficient evidence for a jury to reasonably conclude beyond a reasonable doubt that Williams was aware with substantial certainty that her failure to obtain medical care for Braylan would result in serious bodily injury or death, there was sufficient evidence for the jury to reasonably conclude beyond a reasonable doubt that she was aware of the substantial risk she was taking by failing to obtain medical care for her son. Williams consciously chose to ignore that risk. Consequently, the disregard of this risk constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation. *See Williams*, 235 S.W.3d at 755-56.

The emergency room physician testified that had he had a chance to treat Braylan sooner, Braylan could possibly have survived his injuries. According to the emergency room physician, Braylan certainly would have had a better chance of surviving the injuries had he arrived at the ER while still breathing.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational juror could reasonably infer that Williams was aware of a substantial

and unjustifiable risk that Braylan would suffer serious bodily injury or death if she did not seek medical care for him. Williams, however, consciously and unjustifiably ignored that risk and failed to seek reasonable medical treatment for her son, instead choosing to take him around town and hoping that no harm had resulted from her having pulled on his neck. In such circumstances, Williams acted recklessly. *See Williams*, 235 S.W.3d at 751 (quoting ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 849, 850 (3rd ed. 1982) ("[I]f the actor was aware of the risk he was creating, and consciously disregarded that risk, however much he may have hoped that no harm would result, he was acting recklessly."); *see also* Tex. Penal Code Ann. § 6.03(c). Consequently, we conclude that the evidence in this record supports only a conviction for the lesser-included offense of reckless injury to a child.

The jury charge in this case did not submit the culpable mental state of recklessness to the jury for consideration. However, we may modify the judgment even if the lesser-included offense was not submitted to the jury. *See Bowen v. State*, 374 S.W.3d 427, 432 (Tex. Crim. App. 2012). We therefore modify the judgment of conviction and render a conviction for Injury to a Child, a second-degree felony, and, as modified, affirm the finding of guilt. We reverse the portion

41

of the judgment imposing sentence and remand the cause to the trial court for a new punishment hearing.

AFFIRMED AS MODIFIED IN PART; REVERSED AND REMANDED IN PART.

_____
CHARLES KREGER
Justice

Submitted on July 1, 2013
Opinion Delivered March 19, 2014
Do not publish

Before McKeithen, C.J., Kreger and Horton, JJ.